Paul M. Kampfer (PK 9186)
Hiller, PC
Attorneys for Plaintiff
641 Lexington Avenue, 29th Floor
New York, New York 10022
Telephone: (212) 319-4000
Facsimile: (212) 753-4530
pkakmpfer@hillerpc.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| WILLIAM MASON, | Civil Action No.: 26-1429 |
| Plaintiff, | **COMPLAINT** |
| -against- | ECF Case |
| CIGNA LIFE INSURANCE COMPANY OF NEW YORK and NEW YORK LIFE INSURANCE COMPANY | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**WILLIAM MASON**, as and for his complaint against defendants, alleges as follows:

**PRELIMINARY STATEMENT**

1.   By this action, plaintiff William Mason ("Bill") seeks to recover, pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, *et. seq.*, *inter alia*, the long-term disability benefits ("LTD Benefits") to which he is entitled under the terms of an employee benefit plan issued to him through his employer, American Jewish Committee ("AJC"), along with attorneys' fees, pre-judgment interest, and costs.

2.   As set forth below, until he became disabled, Bill worked as a Senior Desktop Engineer for AJC ("Regular Occupation"). He was thriving in his Regular Occupation, and looked forward to future advancement in his career. Unfortunately, Bill's career was cut short in March

2025 as a result of post-acute sequelae of SARS-CoV-2, more commonly known as Long COVID, which left him with disabling symptoms which include, *inter alia*: unrelenting fatigue, post-exertional malaise ("PEM"), trouble sleeping, unrefreshing sleep, exercise intolerance, brain fog and cognitive deficits, word finding difficulty, headaches, aches, pains, and cramps throughout his body, palpitations, rapid heartbeat, autonomic dysfunction, lightheadedness, flu-like symptoms, rashes, and sensitivity to light (collectively, "Disabling Symptoms").

3. Unable to continue working, Bill filed a long-term disability claim ("Claim") with defendant New York Life Insurance Company ("NY Life") on November 3, 2025. To date, over 105 days have elapsed and NY Life has yet to render a decision on Bill's Claim in violation of the Department of Labor's ERISA claims procedure regulations found at 29 C.F.R. §2560.503-1 ("ERISA Claims Procedure Regulations). As a result, Bill has been forced to exercise his rights under the ERISA Claims Procedure Regulations and commence this action. As set forth below, Bill, since March 27, 2025, has been, and continues to be, disabled under the American Jewish Committee Long Term Disability Plan ("Plan").

4. The objective medical evidence and the opinions of Bill's treating physicians unequivocally support his "Disability" as defined by the Plan.

**PARTIES**

5. Bill is a citizen of the State of New York, County of Queens.

6. At all relevant times, Bill was and is a participant, within the meaning of §(3)(7) of ERISA, 29 U.S.C. §1002(7), in the Plan.

7. Upon information and belief, defendant CIGNA Life Insurance Company of New York ("CLICNY") is an insurance company that is licensed to do, and conducts, business in the

State of New York, with a principal place of business located at 51 Madison Avenue, New York, New York 10010.

8. Upon information and belief, CLICNY is, and at all relevant times herein has been, the claims administrator of the Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. §1002(16)(A).

9. Upon information and belief, CLICNY is, and at all relevant times herein has been, a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

10. Upon information and belief, CLICNY is, and at all relevant times herein has been, a trustee of the Plan.

11. Upon information and belief, defendant New York Life Insurance Company (NY Life, previously defined) is an insurance company that is licensed to do, and conducts, business in the State of New York, with a principal place of business located at 51 Madison Avenue, New York, New York 10010.

12. Upon information and belief, in December 2020 NY Life acquired, *inter alia*, CIGNA Group's disability insurance business and assumed administration of, and liability for, long-term disability claims under policies/plans underwritten by CLICNY (among others), such as the Plan at issue in this case.

13. Upon information and belief, at the time NY Life acquired CIGNA, CLICNY was renamed New York Life Group Insurance Company of NY (*see* Ex. A), and became a subsidiary of NY Life (*i.e.*, CLICNY was directly controlled by NY Life) (*see* Ex. B, Schedule Y).

14. Upon information and belief, NY Life is, and at all relevant times herein has been, the claims administrator of the Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. §1002(16)(A).

3

15. Upon information and belief, NY Life is, and at all relevant times herein has been, a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

16. Upon information and belief, NY Life is, and at all relevant times herein has been, a trustee of the Plan.

17. Upon information and belief, the Plan is fully funded and insured by NY Life and/or CLICNY (together, "Defendants").

18. The Plan provides LTD Benefits to eligible plan participants in accordance with, and pursuant to, Group Contract No. SGE-600257.

19. Immediately prior to becoming disabled, Bill was employed by AJC as a Senior Desktop Engineer.

20. As an employee of AJC, Bill was enrolled in the Plan, which provides LTD Benefits to eligible plan participants in accordance with, and pursuant to, Group Policy No. SGE-600257.

21. Upon filing his Claim, all correspondence and communications regarding Bill's Claim were from NY Life and printed on the letterhead of New York Life Group Benefits Solutions.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to §502(e)(1) of ERISA, 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

23. This court has personal jurisdiction over the defendants, in that ERISA provides for nationwide service of process. 29 U.S.C. §1132(e)(2).

24. Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because much of the conduct that is the subject of this lawsuit occurred within this District and multiple defendants conduct business within this District.

**STANDARD OF REVIEW**

25.     This case is subject to *de novo* review because the Plan document does not contain an effective grant of discretionary authority to either NY Life or CLICNY.

26.     Even if the Plan document were to effectively grant discretionary authority to defendants, this case would still be subject to *de novo* review because NY Life and CLICNY failed to strictly comply with the ERISA Claims Procedure Regulations, and its failure to comply was neither inadvertent nor harmless.

27.     Even if the Plan document were to effectively grant discretionary authority to either NY Life or CLICNY, this case would still be subject to *de novo* review because, as a result of the failure by NY Life and CLICNY to strictly comply with the ERISA Claims Procedure Regulations, Bill's Claim was deemed denied as a matter of law, and he has chosen to pursue his remedies under section 502(a) of ERISA.  In such circumstances, Bills's Claim is deemed denied without the exercise of discretion by an appropriate fiduciary.

28.     In addition, upon information and belief, NY Life and CLICNY have not adopted claim procedures in accordance with the Department of Labor regulations.

29.     For these reasons, the case is subject to *de novo* review.

**CLAIM FACTS**

*Bill's Regular Occupation*

30.     Prior to his disability, Bill worked as a Senior Desktop Engineer for AJC (Regular Occupation, previously defined).  Bill's Regular Occupation required him to provide essential support for AJC's computer system environment and network, and assist staff with daily issues.  Bill's Regular Occupation was complex and demanding.  Specifically, among other things, Bill's Regular Occupation required him to:

- Install, configure, and maintain PC/Mac/laptop software and hardware;

- Perform help desk and desktop support activities as needed;

- Support AJC staff with workstation, server, software, hardware, network, telephony, and cloud system issues and questions;

- Help train AJC staff with all newly implemented technologies;

- Perform skilled work in installation, maintenance, diagnostics, and troubleshooting of all AJC implemented infrastructure systems;

- Monitor system hardware/software with minimal guidance;

- Assist in managing Active Directory, Group Policy, DHCP, DNS, Azure AD;

- Support all security products in the environment;

- Assist in the support of all SaaS implemented technologies (email, file sharing, backups, security, systems management software);

- Assist in the support of wireless networks;

- Assist in the support of Secure Mobile Access;

- Support password management, MFA, SSO, and MDM;

- Assist in documentation of existing and new processes and procedures collaboratively with Director of Infrastructure;

- Support mobile devices;

- Maintain DNS, MX, TXT records, and domain register duties;

- Keep up to date with the latest technologies and regular training;

- Work collaboratively with individuals from diverse backgrounds;

- Demonstrate excellent communication skills (written, verbal, and listening);

- Demonstrate strong organization and project management skills, including the ability to set priorities and meet deadlines;

- Demonstrate excellent attention to detail and follow-through;

- Multitask and work in a fast-paced and changing environment;

- Work outside of standard working hours, including early mornings, evenings, and/or weekends; and

- Demonstrate proficiency in Microsoft Office (Word, Excel, PowerPoint, Teams, and Outlook), Google Suite applications, and Zoom.

31. Bill wanted nothing more than to continue working in his Regular Occupation and helping to keep AJC's computer systems and networks running smoothly. Unfortunately, after struggling with his symptoms for over six months, Bill was forced to stop working on March 27, 2025 on account of his medical condition and Disabling Symptoms.

*Bill's Disabling Symptoms and Disability*

32. Bill suffers from Long COVID, with disabling symptoms which include, *inter alia*: unrelenting fatigue, PEM, trouble sleeping, unrefreshing sleep, exercise intolerance, brain fog and cognitive deficits, word finding difficulty, headaches, aches, pains, and cramps throughout his body, palpitations, rapid heartbeat, autonomic dysfunction, lightheadedness, flu-like symptoms, rashes, and sensitivity to light (Disabling Symptoms, previously defined).

33. Bill tried to keep working in spite of his Disabling Symptoms for as long as possible, but he was struggling to complete his job duties. By March 2025 Bill's Disabling Symptoms became so severe that he was forced to stop working and apply for Short Term Disability ("STD"), and then LTD Benefits.

34. Immediately after he stopped working, Bill applied for STD with ShelterPoint Life Insurance Company ("ShelterPoint"). ShelterPoint approved Bill's STD claim for the maximum benefit period from approximately March 27, 2025 through approximately October 1, 2025. Thereafter, Bill filed his Claim for LTD Benefits.

*Bill's Claim for LTD Benefits*

35. In accordance with the Plan, Bill provided Notice of Claim to NY Life on or about September 12, 2025. Thereafter, on November 3, 2025, Bill officially submitted his Claim to NY Life by submitting the necessary claim forms along with proof of loss.

36. Under the Plan, "Disability/Disabled" is defined as follows:

**Definition of Disability/Disabled**

An Employee will be considered Disabled if, because of Injury or Sickness,
1. he or she is unable to perform the material duties of his or her regular occupation, and solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings; and
2. after Disability Benefits have been payable for 24 months, he or she is unable to perform the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, and solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings.

37. The Plan provides for LTD Benefits in the amount of 60% of Bill's monthly earnings prior to his Disability.

38. Bill's Disabling Symptoms meet (and indeed exceed) the definition of "Disability" under the Plan.

39. Every physician and other treatment provider who has examined Bill in connection with his Disabling Symptoms concluded that he is Disabled.

40. In a Medical Request Form and Physical Ability Assessment dated October 15, 2025, treating physical medicine and rehabilitation specialist, Jonathan Whiteson, M.D. diagnosed Bill with Long COVID with symptoms including fatigue, brain fog, cognitive disorder, headaches, and body aches. Dr. Whiteson concluded that Bill: is unable to engage in sustained physical or cognitive tasks; must take frequent breaks to avoid fatigue; and suffers from unpredictable symptoms that are triggered and worsened by exertion.

41. In the Physical Ability Assessment, Dr. Whiteson provided Bill's specific restrictions and limitations. Specifically, Dr. Whiteson reported that Bill can sit and stand occasionally (*i.e.*, up to 2.5 hours per day), and must avoid walking, reaching, fine manipulation, simple grasp, firm grasp, lifting, carrying, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, and using his lower extremities for foot controls.

42. Bill's Disabling Symptoms and the restrictions and limitations set forth by Dr. Whiteson are objectively confirmed by a two-day cardiopulmonary exercise test ("Two-Day CPET").

43. Bill underwent a Two-Day CPET with Dr. Betsy Keller at the PaceForward Foundation on October 13 and October 14, 2025. The Two-Day CPET objectively confirmed, *inter alia*, Bill's fatigue, PEM, exercise intolerance, ventilatory limitation, insufficient oxygen delivery, chronotropic incompetence, and slow heart rate of recovery.

44. Based on the results of the Two-Day CPET, Dr. Keller concluded that Bill is totally disabled and unable to work in any capacity, confirming that Bill's PEM, debilitating fatigue and other significant deficiencies prevent him from performing his routine activities of daily living, let alone performing the demanding duties of his Regular Occupation.

45. In her Report, Dr. Keller established that:

> Based on these results, Mr. Mason's response to a standardized exertional stressor indicates **highly abnormal ventilatory responses** to exertion. Consequently, efforts to persist in work will exacerbate his illness symptoms (pain, fatigue, immune activation, post-exertional malaise, disrupted sleep, PEM, etc.) and will worsen over time making it impossible for him to perform a job. Regardless of Mr. Mason's energy producing capacity, his ventilatory/autonomic dysfunction is a significant contributor to his exertion intolerance and on-going symptoms. Both the cognitive and physical demands of work exceed his ability to tolerate typical job demands. Efforts to perform his job or any job will worsen his already severe symptoms and accelerate his functional decline beyond the loss of functional capacity he has experienced since the onset of his illness (emphasis in original).

46.     In her Report, Dr. Keller further reported that Bill will experience a worsening of his Disabling Symptoms simply by being in an upright position (*i.e.*, sitting or standing); "[s]ymptoms associated with insufficient oxygen delivery, including pain, cognitive dysfunction, disrupted sleep, and fatigue will be exacerbated with efforts to exert during sustained upright sitting or standing."

47.     Dr. Keller concluded that:

> The collective results of this test indicate that Mr. Mason's ability to carry out normal daily activities is **very limited** and renders him unable to tolerate any reasonable sedentary work on a sustained basis. Most notably, heart rate, ventilatory, and symptomatic responses to exertion contributed to a **very low ventilatory/anaerobic threshold (VAT) level of energy production. For those with fatiguing illnesses such as ME/CFS or long COVID, exerting above VAT will exacerbate illness symptoms**. Evidence from Mr. Mason's job demands and the results of this test indicate that efforts to perform work will exacerbate his illness symptoms.  While a sedentary job is considered appropriate if an individual can sustain that job at 30% of peak MET level, Mr. Mason reaches 30% of peak METs merely lying quietly while watching television (1.0 MET).  In contrast, walking around a workplace for 2 hours (3.0+ METs) as required by a sedentary job, for example, would exceed this threshold, and require that he work above his VAT level of energy production. Sequential symptom surveys describe his abnormal and severe responses to exertion and exacerbation of symptoms.  Consistent with his dysfunction, efforts to work, particularly while standing or sitting, on successive days or successive hours of work within a day will provoke his illness symptoms and make his job or any sedentary-level work untenable **because it will exceed his VAT level of energy production**.  To be clear, test results indicate that Mr. Mason would regularly require multiple recovery breaks within a day, and successive days off work each week due to exertion intolerance.  He would routinely experience symptom exacerbation while attempting to work at a job (emphasis in original).

48.     Despite this overwhelming objective evidence of Disability, to date, NY Life has not rendered a decision on Bill's Claim.

*NY Life's Failure to Render a Decision on Bill's Claim*

49.     Bill submitted his complete Claim with proof of loss to NY Life ("Application") on November 3, 2025.  Via email dated November 5, 2025, NY Life confirmed receipt of Bill's Application for LTD Benefits.

50. According to the ERISA Claims Procedure Regulations, NY Life had 45-days following the receipt of the Application to notify Bill of a decision on his Claim ("Deadline"). NY Life's Deadline could have been extended by 30 days ("Extended Deadline") had NY Life both: (a) determined that such an extension is necessary *due to matters beyond the control of the plan*, and (b) notified Bill, *prior to the expiration of the 45-day period* of the circumstances requiring the extension of time and the date by which NY Life expected to make a decision. In addition, NY Life's Extended Deadline could have been extended by an additional 30 days (for a total of 60 days beyond the initial 45-day Deadline) had NY Life both: (a) determined that such an extension is necessary *due to matters beyond the control of the plan*, and (b) notified Bill, *prior to the expiration Extended Deadline* of the circumstances requiring the extension of time and the date by which NY Life expected to make a decision. *See* 29 C.F.R. §2560.503-1(f)(3)).

51. The 45-day Deadline within which NY Life was required to render a decision on Bill's Claim expired on December 18, 2025.

52. In violation of the ERISA Claims Procedure Regulations, NY Life did not render a decision on Bill's Claim on or before the Deadline.

53. To date, NY Life has not rendered a decision on Bill's Claim.

54. NY Life did not notify Bill that it needed an extension on or before the Deadline. Indeed, to this date, NY Life never notified Bill that it needed an extension of time to render a decision on his Claim.

55. In any event, NY Life did not have grounds to take an extension of the Deadline. Specifically, any delay in NY Life's review of Bill's claim was *not* due to circumstances beyond its control; NY Life was in receipt of Bill's Claim as of November 3, 2025, and had ample time to render a decision.

11

56. Not only has NY Life failed to render a decision on Bill's Claim, but NY Life did not provide any written communications whatsoever to Bill between November 5, 2025 (*i.e.*, NY Life's email confirming receipt of Bill's Application) and January 6, 2026 (*i.e.*, 19 days after the Deadline had already expired).

57. Via letters dated January 6, 2026 and January 9, 2026, NY Life requested additional information from Dr. Keller. Notably, neither of these letters advised that NY Life needed an extension of time to render a decision on Bill's Claim.

58. Even though NY Life was already in violation of the ERISA Claims Procedure Regulations, and even though Bill was well within his right to file a lawsuit as of December 19, 2025, Bill, through counsel, submitted the requested information from Dr. Keller on January 26, 2026 -- information which provided additional support of his Disability.

59. Since January 26, 2026, another 24 days have elapsed and NY Life still has not rendered a decision on Bill's Claim.

60. The ERISA Claims Procedure Regulations require that an ERISA administrator (*i.e.*, NY Life) must "strictly adhere" to all claim handling requirements set forth in 29 C.F.R. §2560.503-1, and any failure to do so immediately results in the claimant being: (1) deemed to have exhausted his administrative remedies (*i.e.*, Bill's claim is deemed denied as a matter of law) and (2) entitled to file suit in federal court. 29 C.F.R. §2560.503-1(l)(2).

61. Under the ERISA Claims Procedure Regulations, NY Life's 45 day deadline for rendering a decision on Bill's Administrative Appeal was December 18, 2025.

62. NY Life did not render a decision on Bill's Claim by December 18, 2025, and failed to properly take an extension of the Deadline resulting in a deemed denied Claim.

63. To date, NY Life has not rendered a decision on Bill's Claim.

*Defendants' Conflict of Interest*

64. At all relevant times, NY Life and CLICNY have been operating under an inherent and structural conflict of interest because, on the one hand, Defendants are financially liable for benefit payments to Bill and, on the other hand, each payment issued depletes Defendants' assets.

65. Defendants' failure to render a decision on Bill's Claim was influenced by this conflict of interest.

66. Defendants' conflict of interest extended to and infected its in-house medical and vocational consultants ("In-House Consultants").

67. Upon information and belief, Defendants' In-House Consultants have conducted reviews in connection with the claims of numerous other individuals insured by Defendants.

68. NY Life and CLICNY know, or have reason to know, that its In-House Consultants are hired and/or retained to complete file reviews to serve insurance companies, rather than the individual claimant.

69. Upon information and belief, NY Life and/or CLICNY pay substantial sums of money to its In-House Consultants to conduct reviews of Defendants' insureds.

70. Because Defendants' In-House Consultants derive substantial income from performing file reviews for NY Life and/or CLICNY, the In-House Consultants have an incentive to provide file reviews and assessments that Defendants deem favorable in order to perform future file reviews for Defendants and/or retain their jobs.

71. NY Life and CLICNY have failed to take active steps to reduce potential bias and to promote the accuracy of its benefit determinations.

**FIRST CAUSE OF ACTION**

72. Bill repeats and realleges the allegations contained in the preceding paragraphs 1 through 71 inclusive, as if set forth fully herein.

73. Bill is, and at all relevant times herein has been, a participant and beneficiary under the terms of the Plan.

74. Bill and/or AJC paid all required premiums under the Plan.

75. Bill otherwise complied with all requirements of the Plan.

76. NY Life and/or CLICNY accepted all of Bill's premium payments under the Plan.

77. Bill timely applied for LTD Benefits under the Plan.

78. At all relevant times since March 27, 2025, Bill has been totally Disabled under the terms of the Plan.

79. Under the Plan, Bill is entitled to LTD Benefits because he suffers from a "Disability" as defined in the Plan.

80. NY Life and CLICNY failed to pay Bill his LTD Benefits to which he is rightfully entitled from September 23, 2025 (following the Benefit Waiting Period) through the present date.

81. Bill has satisfied all conditions precedent under the Plan and is, therefore, eligible to receive LTD Benefits beginning September 23, 2025.

82. By virtue of NY Life's failure to render a decision on Bill's Claim within its 45 day Deadline (*i.e.*, Defendants' failure to strictly comply with the ERISA Claims Procedure Regulations), Bill's Claim is deemed denied, and he is deemed, as a matter of law, to have exhausted the administrative remedies under the Plan.

83. Defendants' failure to render a decision on Bill's Claim is and has been wrongful, illegal, arbitrary and capricious, in bad faith, and is otherwise violative of the Plan as well as the

provisions and regulations of ERISA.

84.     NY Life and CLICNY have financial conflicts of interest with respect to handling and administering Bill's Claim.

85.     NY Life and CLICNY were influenced by their financial conflict of interest, as both the administrators of the Plan and the payors of benefits thereunder, when failing to render a decision on Bill's Claim.

86.     Without limitation, Defendants' unlawful, arbitrary, and capricious misconduct is evidenced by, *inter alia*, the following:

(a)     Unreasonably withholding payments from Bill knowing his Claim for benefits was and is valid;

(b)     Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting a denial of Bill's Claim;

(c)     Disregarding the conclusions of Bill's treating physicians and the objective evidence supporting his Claim;

(d)     Disregarding Bill's self-reported and/or subjective complaints, his own assessment of his Disabling Symptoms, and how they limit and restrict his ability to perform the duties of his Regular Occupation in violation of 29 C.F.R. §2560.503-1(h)(2)(iv);

(e)     Engaging in a pattern of procedural irregularities to advance its own corporate interests to the detriment of LTD Plan participants;

(f)     Failing to provide a "full and fair review" as required by 29 C.F.R. §2560.503-1(h)(4);

(g)     Failing to maintain and utilize "reasonable claims procedures" as required by 29 C.F.R. §2560.503-1(b), in violation of ERISA;

(h)     Consistently acting in its own corporate interests instead of those of the Plan and its participants, such as Bill; and

(i)     Failing to render a decision on Bill's Claim pursuant to 29 C.F.R. §2560.503-1(f)(3).

87. Defendants' unlawful behavior and violations of the ERISA Claims Procedure Regulations were purposeful and harmful to Bill.

88. A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 195 (2008), applies to evaluating the actions of NY Life in this case.

89. NY Life and CLICNY were required to discharge its fiduciary duties "solely in the interests of the participants and beneficiaries of the plan."

90. NY Life and CLICNY violated the "higher than marketplace" standards imposed by ERISA.

91. NY Life and CLICNY breached their fiduciary duty by failing to render a decision on Bill's Claim.

92. NY Life and CLICNY placed their financial interest in reducing expenses and increasing profitability above Bill's interests under the Plan to receive his LTD Benefits.

93. Bill has been forced to bring the instant action as a direct result of Defendants' unlawful violations of the Plan and ERISA.

94. Under Section 502(a)(1)(B) of ERISA, 29 C.F.R. §2560.503-1(a)(1)(B), Bill is entitled to an order: (i) directing Defendants to make equitable restitution with respect to, and/or otherwise make payment of, all back LTD Benefits from September 23, 2025 to date, with interest; and (ii) declaring that Bill is entitled to continue receiving his LTD Benefits for so long as he continues to be "Disabled" as defined by the Plan.

**SECOND CAUSE OF ACTION**

95. Bill repeats and realleges the allegations contained in the preceding paragraphs 1 through 94 inclusive, as if set forth fully herein.

96. Under 29 U.S.C. §1132(g)(1), Bill is entitled to his reasonable attorneys' fees and costs incurred in an action to recover his LTD Benefits.

97. As a result of Defendants' breaches and failings, Bill has retained the services of legal counsel and has necessarily incurred attorneys' fees and costs in prosecuting this action.

98. Bill anticipates incurring further additional attorneys' fees and costs hereinafter in pursuing this action, all in a final amount to be determined by the Court.

99. By reason of the foregoing, Bill is entitled to an award of reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons stated, Bill is entitled to judgment over and against Defendants as follows:

(i) directing Defendants to make equitable restitution with respect to, and/or otherwise make payment of, all back LTD Benefits from September 23, 2025 to date;

(ii) declaring that Bill is entitled to continue receiving his LTD Benefits for as long as he continues to be disabled under the terms of the Plan;

(iii) awarding Bill reasonable attorneys' fees, pre-judgment interest, and costs; and

(iv) such other relief as this Court may deem just and proper.

Dated: New York, New York
February 19, 2026

                                        **HILLER, PC**
                                        *Attorneys for Plaintiff*
                                        641 Lexington Avenue, 29th Floor
                                        New York, New York 10022
                                        (212) 319-4000

By: _____
                                        Paul M. Kampfer (PK 9186)